CITY OF ST. LOUIS, a Municipal Corporation, Plaintiff-Respondent,

v.

Sam GOLDENBERG et al., Defendants-Appellants.,

and

Sam Demba & Sons Realty Company, Defendant.

No. 36095.

Missouri Court of Appeals, St. Louis District, Division 1.

Oct. 14, 1975.

34

Blumenfeld, Kalishman, Marx, Tureen & Paster, P.C., Phillip J. Paster and Michael S. Moran, Clayton, for appellants.

James J. Wilson, Assoc. City Counselor, St. Louis, for City of St. Louis.

LeMay & Dunlop, Clayton, for respondent Cleary.

Ralph H. Schnebelen, St. Louis, for respondents, Salsich & USRIC.

RENDLEN, Judge.

Appellants seek review of the trial court's judgment overruling their motion to surcharge the Receivers of appellants' five unit rental flat located at 5039–41 Enright Avenue in the City of St. Louis. The motion was filed as a part of an ongoing equity proceeding, instituted under the provisions of § 441.500–640 RSMo 1969, V.A.M.S., known as the "Enforcement of Minimum Housing Code Standards Act."

Pursuant to authority of the act, the City through its Building Commissioner brought an equitable action on October 16, 1970, alleging numerous housing code violations existed on appellant's property. The City further alleged that appellants received notice of these violations on September 27, 1969, and as recently as September 22, 1970, the violations were not abated. That the property in its then condition constituted a public nuisance and a continuing danger to the public health and safety. By consent, the cause was submitted without argument. On April 1, 1971, the court, finding a nuisance did exist, ordered all present and future rent paid into the court and appointed respondent Thomas Cleary receiver of the

property.[1] The receiver was ordered to take possession of the property, collect all rents and profits, pay all costs of management, including insurance premiums and taxes and remove with all reasonable speed the housing code violations.[2] To that end the receiver was given a lien upon the rents for the expenses necessarily incurred in the execution of the court's order and that lien to have priority over all others except taxes, assessments and mortgages recorded before October 13, 1969. His authority included the right of issuance of receiver's certificates.[3] The court further authorized compensation for the receiver of $50 per month.

The trial court has provided no findings of fact or conclusions of law, none having been requested, and in such cases "all fact issues shall be deemed found in accordance with the result reached and the judgment must be affirmed, if it is correct on any reasonable theory supported by the evidence." *Gottlieb v. LaBrunerie*, 514 S.W.2d 27, 28[1] (Mo.App.1974).

From the evidence adduced at the motion hearing, the trial court could reasonably have found the following:

At the commencement of the receivership, appellants' property was subject to a deed of trust given to secure the payment of promissory note in the amount of $12,000 for the benefit of Sam Demba & Sons Realty Company, one of the named defendants in the original action. This deed of trust encumbered three other multi-family dwellings, not involved here. The building was protected by a policy of fire insurance *purchased by the mortgagees* providing $20,000 coverage for the term January 1, 1971 to January 21, 1972. At that time four apartments were occupied.

Receiver Cleary qualified, assumed his duties on April 9, 1971, and for a few months was able to collect rents, but only $410.10. He paid these expenses: water, $85.85; boardup, $39.85; money order expense, $2.65; bank service charge, $.30, totaling $128.65. In the month preceding Cleary's appointment, the owners (appellants here) had been able to collect rents of only $91. Though the building at one time brought in $480 per month, the owners had lost money on the property for several years prior to this proceeding.

Notwithstanding his considerable efforts, the receiver was unable to secure financing for necessary repairs to the premises, the cost of which was estimated at $5,000. He diligently sought to keep the then tenants and promised as soon as money was available repairs would be undertaken to make the apartments habitable. The funds could

1. Section 441.570 RSMo 1969: "The court may, after hearing and finding the dwelling unit or building constitutes a nuisance,
   (1) Direct that present and future rents due from one or more occupants be deposited by the occupant or occupants with the clerk of the court as such rents fall due, or
   (2) Allow the owner a reasonable time to correct the deficiencies. Any rents deposited under the provisions of this section shall be held by the court until the deficiencies noted in the building have been remedied, and shall not accrue interest during the time they are so held. Upon the completion of the work required to abate the nuisance, any remaining surplus after authorized disbursements and payments of cost shall be forwarded to the owner, together with a complete accounting of the rents deposited and the costs incurred."

2. As authority for the court's order, see § 441.590[4, 5] RSMo 1969, which provide in part as follows: "The receiver may on order of the court take possession of the property, collect all rents and profits accruing from the property, and pay all costs of management, including all insurance premiums and all general and special real estate taxes or assessments . . . The receiver shall with all reasonable speed remove all of the housing code violation, which constitute a nuisance as found by the court."

3. Section 441.590[6, 7] RSMo 1969: "The receiver may with the approval of the circuit court borrow money against, and encumber, the property . . . The circuit court may authorize the receiver to issue receiver's certificates as security against such borrowings, . . . pledge the rentals from the property and borrow or encumber the property on the strength of the rental income."

not be found, the repairs could not be made and eventually the tenants vacated.

In May, 1971, the receiver submitted a detailed report to the court and City Counselor, summarizing his efforts to clean up the property, work with the tenants and locate funding for the receivership, without which the project was doomed to failure. The receiver discovered and reported the condition of the premises was as bad "as the court order indicated." He arranged with one of the tenants to clean the mess and filth in the basement for $50 but the tenant did not carry out the agreement.

Continuing his efforts, the receiver reported in June that the mortgagee was demanding payments of more than $1,000 on delinquent interest plus payment of current interest and pointed out the extent this complicated his task. He requested a meeting with the court. In August, Cleary made a comprehensive report of the receivership difficulties and in November by further report, explained the urgency of these problems, outlined steps he had taken and explained his inability to operate without financing. The court was able to give little specific guidance except "keep trying." On November 15, 1971, Mr. Cleary submitted his resignation with a letter detailing his difficulties and a summary of funds collected and expenses paid. On December 27 he wrote the court asking what disposition to make of the receivership monies and tendered an account thereof. During all this time, the receiver reported to the City Counselor seeking his advice and guidance. The court entered an order accepting Cleary's resignation, upon filing his final report and appointed Peter W. Salsich and Union-Sarah Realty Investment Corporation, co-receivers, they to furnish bond of $5,000. Neither Salsich nor "Union-Sarah Realty" filed such bond as receivers. Though Cleary did not file a formal final

accounting until October 2, 1972, he had previously reported all monies collected and expenses paid.

The Division of Building and Inspection on February 4, 1972, issued a repair or wreck order against the property and on June 20 of that year the building was gutted by fire. At that time real property taxes on the premises were three years delinquent.

On June 28, 1973, at a hearing on a motion to discharge receivers, appellants moved to surcharge the receivers $20,000, alleging negligence and dereliction of duty to preserve and repair the property. Following an evidentiary hearing, the motion to surcharge was overruled and from this judgment the owners appeal.

◼ In this court-tried equitable proceeding we ". . . review the case de novo upon both the law and the evidence, giving deference to the opportunity afforded the trial court to judge the credibility of the witnesses, and not disturb the judgment unless clearly erroneous." *Borgmann v. Florissant Development Co.*, 515 S.W.2d 189, 191[1] (Mo.App.1974); *Blumenberg v. Minton*, 507 S.W.2d 26, 27[3] (Mo.App.1974). "Clearly erroneous" in this context means "incorrect." *Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d 719, 724[1] (Mo.App.1974); *Mission Insurance Co. v. Ward*, 487 S.W.2d 449, 452 (Mo. banc 1972).

◼ The case requires an examination of the receivers' performance[4] as prescribed by the statutes and set forth in the appointing order. The court's order is little more than an enumeration of pertinent statutory powers available to receivers; however, the statute provides no standard or statement of the required level of care.

---

4. The motion to surcharge was filed against receiver Cleary and successor receivers Peter W. Salsich and Union-Sarah Realty Investment Corporation, though through most of the receivership period, Cleary alone served as receiver. Following his motion for discharge the court made its order appointing receivers Peter W. Salsich and Union-Sarah Realty Investment Corporation and as pointed out herein, the record is not clear concerning what function if any they performed.

Accordingly, we turn to the general law to find the prescribed standard of performance. It appears that "A receiver, in caring for the property or managing the business over which he has been appointed, is bound to proceed with at least ordinary care and prudence. When he uses ordinary care and prudence, that is, the care and diligence which an ordinarily prudent man uses in handling his own estate, he has fulfilled the measure of his official duty, and is not answerable for losses which occur to the property and assets in his charge; but when he fails to exercise this degree of care and diligence, he becomes answerable for the consequences of his neglect or dereliction. He is not an insurer of the safety of the property; ordinary care is the test of his responsibility." 66 Am.Jur.2d Receivers § 367, p. 184; *Vander Vorste v. Northwestern National Bank*, 81 S.D. 566, 138 N.W.2d 411 (1965); 20 A.L.R.3d 960. "So a receiver is not personally liable for acts done and losses sustained in administering an estate . . . provided he acts in good faith and with ordinary care and prudence." 75 C.J.S. Receivers § 189, p. 835. This rule found expression in several cases from sister states including *Athanason v. Hubbard*, 218 So.2d 475, 478[6] (Fla.App.1969), in which a receiver was held not liable for good faith actions, taken while following advice of counsel; and in *Morris v. Pierce*, 188 Okl. 396, 110 P.2d 294 (1940), it was held "A receiver is required to exercise only ordinary care and judgment in the keeping of property coming into his possession as receiver . . . ." Similarly the Texas Court of Civil Appeals in *Harrison v. Coutret*, 157 S.W.2d 454, 456[1] (Tex.Civ.App. 1941) stated: "Having acted within the authority given him in the order appointing him, he is not responsible for any loss which may have accrued, unless he acted in bad faith or failed to use ordinary care and discretion in the management of the business."

Appellants assert that the receivers were negligent in (1) failing to attempt to relet the apartments as they became vacant; (2) making only insignificant attempts to collect rents due after July, 1971; (3) making no attempt to repair the apartments or abate the housing code violations; (4) making no attempt to prevent vandalism; and (5) failing to insure the building against fire. We find these contentions without merit.

This rental property was, at the time it came into the receiver Cleary's hands, in such an unsanitary state of disrepair and dilapidation as to be unfit for human habitation. Repairs necessary to make it habitable would cost approximately $5,000. Receiver Cleary promised the tenants repairs would be made as soon as possible and on the strength of such promises, collected rents of $450. This money was insufficient for the needed repairs. By July, 1971, the tenants no longer believed the improvements could be made, refused to pay more rent and began to vacate the building. Cleary correctly judged the rental income insufficient to provide the extensive repairs required and that receivership certificates would not be salable because of the delinquent outstanding mortgage. Hence he sought financing from the Department of Housing and Urban Development and other public and private organizations, who repeatedly informed him that because of (1) the history of the owner's bad management practices, (2) the outstanding mortgage on the property, and (3) the delinquent real property taxes, no credit would be extended for rehabilitation of the property.

■ Given the condition of the property and the lack of prospect for rehabilitation, the receivers were not bound to relet the premises. If the apartments had been relet, new tenants could refuse to pay for unfit housing or vacate whenever they chose, *King v. Moorehead*, 495 S.W.2d 65 (Mo.App.1973); therefore, the promise of future rents provided no basis to finance needed improvements. Appellant overlooks the receiver's efforts to collect rents and keep the tenants, suggesting he should have sued to collect the rents. We are not im-

pressed with this argument since any action for rents would meet an affirmative defense that the condition of the let premises was in substantial violation of the applicable housing code and not habitable during the tenancy. *See King v. Moorehead*, 495 S.W.2d 65 (Mo.App.1973). The tenants justifiably vacated and withheld further rents. The meager rent collected and the receiver's inability to obtain financing, rendered futile any attempt to prevent vandalism or repair the vacant building.

 Concerning the receivers' failure to insure, we find the property was uninsurable and the fund available insufficient to pay the premiums. As mentioned above, a policy of fire insurance had been purchased and maintained on the property by the mortgage holder before the receivership. This Home Insurance Company policy purchased through "Fair Plan"[5] provided there would be no coverage if the property were unoccupied more than sixty days. By December, 1971, the building was totally vacant, the utilities had been cut off at least four or five months prior to the fire, and in February, 1972, the building inspector condemned the property, informing the owners the property must be repaired or be torn down. A representative of the Home Insurance Company explained his company would not have insured the property when the policy expired in January, 1971, unless ordered to do by the "Fair Plan." Mr. Bernard, the manager of "Fair Plan," testified that the "Fair Plan" would not have required renewed coverage on the property since property taxes were three years delinquent at the time of the fire. The statute and the court's order gave the receiver authority to insure but the uninsurability and lack of funds effectively vitiated this responsibility. It is the general rule that "[a] receiver, acting in good faith and within the authority conferred on him, is not liable in his personal capacity for losses resulting from . . . failure to insure property."

75 C.J.S. Receivers § 189, p. 835; *Meltzer v. Grazi*, 10 A.D.2d 869, 200 N.Y.S.2d 733, 735 (1960), app. dism. 8 N.Y.2d 911, 204 N.Y. S.2d 154, 168 N.E.2d 828 (1960), app. den. 11 A.D.2d 948, 206 N.Y.S.2d 553 (1960). From this record we cannot say the receiver acted other than in good faith and within the authority conferred by the order of the court.

 In sum, the receivers were placed in an untenable position for it was impossible financially to carry out the order to rehabilitate the property. Receiver Cleary's efforts to collect rents, let the property and obtain necessary financing were reasonable and proper under the circumstances. By December, 1971, the building was an uninsurable derelict, of minimal value and not economically salvageable. The fire and the alleged diminution of value was not the result of any negligence or misconduct of the receivers.

The judgment of the trial court overruling the motion to surcharge is affirmed.

WEIER, P. J., and DOWD, J., concur.

---

**5.** Little detail as to the workings of Manager Insurance Placement, or "Fair Plan" was brought out. It is apparently a program

established pursuant to state law designed to guarantee the availability of insurance to owners of difficult to insure property.