Leonard H. Sandler, J.
At a time when the basic fairness and reasonableness of the rules of law regulating relations between landlords and residential tenants are under cogent and persuasive challenge, these nonpayment proceedings against three tenants raise questions of grave importance concerning the capacity of our courts to adapt older doctrines to the requirements of fair treatment for tenants living today in multiple dwellings, and most especially fair treatment for those who are poor and without resources.
*16 The most urgent question is whether this court is required to issue warrants of eviction for nonpayment at the instance of a landlord who has flagrantly and systematically refused to operate the building from which it derives rent in accordance with the minimum standards of decency prescribed by the Multiple Dwelling Law and the Housing Maintenance Code. Differently phrased, the question is whether there is fixed in the law of this State so firmly that this court is bound to follow it a system of values that regards the right of the. landlord to receive rent as infinitely more important than, and wholly independent of, either his obligation to obey the law or the corresponding right of the tenant to live in a decent apartment maintained in substantial compliance with the law.
A second important question involves the constitutionality of that part of section 302-a of the Multiple Dwelling Law that requires a tenant to deposit in court that rent demanded by a landlord in a nonpayment proceeding before he can interpose the statutory defense that a rent-impairing violation had continued for 6 months.
Finally, the tenants sought by a post-trial motion to conform the pleadings to the proof to secure damages on the ground ■ that the. landlord had failed to maintain adequate security against criminal acts — and that thé failure contributed to numerous crimes against them for which, it is urged, the landlord is responsible on tort principles. The issue sought to be presented is important — and the facts before me present a substantial basis for the claim. (See Kline v. 1500 Massachusetts Ave. Apt. Corp., 439 F. 2d 477.) However, I have determined that the posttrial motion should be denied without prejudice to the claims being presented in a new pleading. The landlord is entitled to meet this substantial issue after adequate notice prior to trial.
The significant facts are not in serious dispute. On or about April 15, 1969, the present owners of 310 West 18th Street (the previous mortgagees) acquired the premises. At that time, and for several years previously, there existed numerous Housing Code violations recorded against the property. The new owners did nothing, or virtually nothing, to correct these violations.
One of the landlord’s principals testified that their plan was to persuade the tenants to leave the building by offering relocation payments, and thereafter to remodel the building. He admitted that the landlord had no plans to correct the violations if all of the tenants did not leave.
The conclusion is inescapable, and I so find, that the landlord’s design was and is to force the tenants to leave by permitting the *17 violations to continue and the living conditions to become increasingly onerous.
Thus, there has persisted from the date of acquisition until trial a host of record violations. One is a rent-impairing violation affecting the entire building; several others are rent-impairing violations affecting individual apartments (though not the apartments of these tenants); and there are some 90 other violations varying in importance and extent, but the cumulative effect of which is to reduce significantly the habitability of the apartments of the tenants. The efforts of code enforcement agencies have been to no avail.
In addition, the evidence strongly suggests that the landlord tried to ‘‘ persuade ’ ’ the tenants to leave by total indifference to the requirements of security against criminal acts. Thus although the lock on the building’s front entrance was broken, the landlord took no steps to repair it for many months. When illegal intruders moved into abandoned rooms, and it became apparent that these included drug addicts with a high potential for crime, the landlord took no action to remove them. Each of these tenants was the victim of several crimes.
I find: (1) that the landlord operated this building in willful disregard of its obligations under the Multiple Dwelling Law and the Housing Code, and that the quality of living for the tenants was significantly impaired as a result; (2) that the code enforcement procedures proved wholly ineffective to induce compliance with the law by this landlord; and (3) that one objective of this landlord’s behavior was to coerce the tenants to abandon their apartments.
At the trial, the tenants acknowledged that they had not paid rent for some time. Two principal defenses were interposed.
First, it was claimed that the landlord had breached a warranty of fitness for use and a warranty of quiet enjoyment, which defenses I interpret as raising the question presented at the outset of this opinion.
Second, it was alleged that a rent-impairing violation under section 302-a of the Multiple Dwelling Law affecting each of the tenants had lasted for 6 months. Since two of the tenants did not deposit the rent demanded by the landlord into court, as required by paragraph c of subdivision 2 of section 302-a, this defense requires the court to consider the constitutionality of that requirement.
In addition, the tenants sought damages for breach of the warranty of fitness for use, or habitability.
In considering whether this court is compelled to sustain the right to rent of a landlord who operates a residential building *18 in systematic violation of the law, I am of course aware of the general view that this issue has been definitively resolved in favor of the landlord by controlling appellate decisions. After a careful analysis of the leading cases I am persuaded that they leave this court ample discretion to achieve decent and fair results in accordance with present day realities, and I intend to exercise that discretion.
The leading cases in this area are Davar Holdings v. Cohen (255 App. Div. 445, rearg. den. 256 App. Div. 806, affd. 280 N. Y. 828) and Emigrant Ind. Sav. Bank v. 108 West 49th St. Corp. (255 App. Div. 570, affd. 280 N. Y. 791), both First Department cases decided within a few months of each other. Considering the tremendous influence these decisions have had on the day-by-day disposition of landlord and tenant matters in the trial courts of this State, it is surely notable that neither of them confronted the Appellate Division with anything approaching the critical problems of fairness and social policy presented by the case before me — problems common to many present day landlord and tenant cases.
In the Davar case (supra) described in the opinion as one of first impression, the lease required the tenant to comply with the requirements of law, and he failed to have the apartment painted. When a violation was issued against the premises because it had not been painted, the landlord undertook to have the painting done himself, but his painter was barred from the apartment by the tenant. Thereafter the tenant had the apartment painted at his own expense and sought to deduct that expense from his rent.
It is surely not surprising that the Appellate Division found for the landlord.
In doing so, however, the court went on to observe that at common law the landlord was under no duty to repair. At page 448 the court said the following: “We are of opinion, therefore, that in a case of this character the tenant may not, himself, procure the required work to be done. Under an order so issued, the controversy is between the landlord and the public authorities. It is the landlord and not the tenant who must satisfy the department that the work has been done properly. The statute providing, as it does, its own penalties, should not, as between landlord and tenant, be further extended in scope. ’ ’
The court also pointed out that if the conditions ordered to be remedied rendered the premises uninhabitable the tenant could have removed, and, in an action for rent, defended on the basis of constructive eviction.
*19 The Emigrant case was similar. The principal distinction is that it involved an action by the lessee of an entire building against an owner. The lessee himself subleased the several apartments to tenants, and the court wisely observed that in any event the Multiple Dwelling Law was intended for the benefit of the tenants actually occupying the apartments, not one in the position of their landlord.
Notwithstanding the widely held view to the contrary, it is my opinion that the Appellate Division did not intend to lay down a rule of universal application, precluding under all circumstances the claim that violations of the Multiple Dwelling Law and the Housing Code are a defense to rent, however substantial and pervasive the violations, and whatever their impact on the habitability of the dwelling. The approach set forth in the Davar opinion seems to me more sensibly construed as designed to apply to the kind of situation before that court— one in which the landlord had acted in good faith, the violation did not significantly impair habitability or create an emergency danger, and in which code enforcement might well have been expected to be effective to achieve the statutory purpose. And this view of the holding seems to me to be powerfully buttressed by considerations of fairness, sound legal principles and compelling social need.
Preliminarily it is clear that the decision was strongly influenced by two factual assumptions, undoubtedly well founded in 1938, but neither of which would be seriously urged as realistic today.
The first assumption was that code enforcement penalties were likely to be effective. But the history of the last 32 years surely demonstrates their inadequacy to assure broad compliance with the law. (See G-ribetz and Grad, Housing Code Enforcement: Sanctions and Remedies, 66 Col. L. Rev. 1254 [1966], Note, Enforcement of Municipal Housing Codes, 78 Harv. L. Rev. 801 [1965].) The facts of the instant case are illustrative. The bulk of the violations here have continued since 1966, and repeated court proceedings by the enforcement agency have wholly failed to move the landlord to obey the law.
The second factual assumption was that a tenant whose apartment had ceased to be habitable could readily move to a suitable apartment maintained in accordance with the law. The sustained and severe housing shortage dating from World War II and the accompanying deterioration of much of our housing supply, have surely rendered constructive eviction an illusory protection for the urban tenant — and especially for the poor tenant. The language in the Davar opinion suggesting that tenants could simply *20 move and then defend against rent proceedings has a nostalgic flavor today.
Without presuming to anticipate that the Appellate Division would overrule Davar because of the subsequent invalidation of two of its basic assumptions, it is surely appropriate to find iu this development additional support for a comparatively limited interpretation of that decision.
Significantly, modern scholarship is unanimous in its outspoken condemnation of the unfairness and harmful social consequences of a doctrine that permits a landlord to recover rent and evict tenants while defying the statutory requirement that he maintain the premises in accordance with the law. (See Quinn and Philips, Law of Landlord-Tenant: a Critical Evaluation of the Past and Guidelines for the Future, 38 Fordham L. Rev. 225; Sax and Hiestand, Slumlordism as a Tort, 65 Mich. L. Rev. 869; Schoshinski, Remedies of the Indigent Tenant: Proposal for Change, 54 Georgetown L. J. 519.)
The origin of that principle has been traced to feudal times when the tenants’ concern was possession of the land, and when, by tenurial concepts, “ rents ” issued directly from the land itself. I am not aware of any persuasive answer to the argument that it is absurd to apply principles rooted in feudalism to modern day apartment dwellers who seek a ‘ ‘ house suitable for occupation ” (Javins v. First Nat. Realty Corp., 428 F. 2d 1071, 1078).
Moreover, the profound incongruity of the older concept with the whole evolution of modern law, premised on the interdependence of rights and responsibilities, has been convincingly demonstrated. (See Quinn and Philips, supra, pp. 225-227 ; Javins, supra, pp. 1075-1077.)
Most important of all, the disastrous social and human consequences of applying outdated concepts to the housing problems of the urban poor have been eloquently described. (See Quinn and Philips, supra; Sax and Hiestand, supra-, Schoshinski, supra.)
Thus, in a widely discussed recent article, two scholars condemned much of the law of landlord and tenant as a “ scandal ”, and went on to say: ‘ ‘ More often than not unjust in its preference for the cause of the landlord, it can only be described as outrageous when applied to the poor urban tenant in the multifamily dwelling. There it views with complacency the most wretched living conditions, littered and unlit hallways, stairways with steps and banisters missing, walls and ceilings with holes, exposed wiring, broken windows, leaking pipes, stoves and *21 refrigerators that do not work or work only now and then. And always the cockroaches, and the dread of the winter cold and uncertain heat ’ ’. (Quinn and Philips, supra, p. 225.)
Finally, the high courts of a number of jurisdictions, when recently confronted with the kind of question here presented, have uniformly responded by overthrowing or modifying drastically the older approach, and by shaping new principles more evenhanded in their treatment of landlord and tenant. (Javins v. First Nat. Realty Corp., supra; Lemle v. Breedan, 462 P. 2d 470 [Hawaii, 1969]; Reste Realty Corp. v. Cooper, 53 N. J. 444; Marini v. Ireland, 56 N. J. 130; Brown v. Southall Realty Co., 237 Atl. 2d 834 [C. A., D. C., 1967]; Pines v. Perssion, 14 Wis. 2d 590; Shiro v. Gould & Co., 18 Ill. 2d 538.)
The most important of these recent cases is Javins {supra) which is destined, in my view, to be a landmark decision. After a comprehensive review of the law and its relation to modern legal development and present conditions, the court concluded (p. 1082): “ We therefore hold that the Housing Regulations imply a warranty of habitability, measured by the standards which they set out, into leases of all housing that they cover * * * Under contract principles, however, the tenant’s obli-
gation to pay rent is dependent upon the landlord’s performance of his obligations, including his warranty to maintain the premises in habitable condition. ’ ’
In view of the foregoing, one must conclude that the doctrine set forth in Davar was intended to be, and now should be, limited to the kind of circumstances then before the court.
I therefore hold that violations of the Multiple Dwelling Law and the appropriate sections of the Housing Code permit residential tenants to raise defenses to nonpayment eviction proceedings in the following three situations, all of which were established by the evidence in this case.
First, where the landlord has not made a good faith effort to comply with the law, and there have been substantial violations seriously affecting the habitability of the premises.
Second, where there are substantial violations and code enforcement remedies have been pursued and have been ineffective.
Third, where substantial violations exist and their continuance is part of a purposeful and illegal effort to force tenants to abandon their apartments.
In the Javins case the Circuit Court plainly declared its view, in accordance with accepted contract principles, that the presence of substantial violations should wholly defeat the claim *22 for rent. A persuasive case can be made, in my opinion, for reducing the rent in proportion to the gravity of the violations (cf. Academy Spires v. Brown, 111 N. J. Super. 477).
In this case however there is one circumstance that requires as a minimal judicial response the denial of all rent: namely, the use by this landlord of long-continued violations as an integral part of his plan to effectuate the removal of all the tenants. Such an illegal, deliberate effort is intolerable, and precludes recovery of any part of the rent claimed.
The above holdings are consistent with the high purposes that induced the Legislature to enact the Multiple Dwelling Law and are essential, in my opinion, to the achievement of those purposes.
Here, as in so many other areas of the law, the words of Justice Cabdozo eloquently describe the human and social reality: “We may be sure that the framers of this statute, when regulating tenement life, had uppermost in thought the care of those who are unable to care for themselves. The legislature must have known that unless repairs in the rooms of the poor were made by the landlord, they would not be made by any one. The duty imposed becomes commensurate with the need. The right to seek redress is not limited to the city or its officers. The right extends to all whom there-was a purpose to protect.” Altz v. Leiberson, 233 N. Y. 16,19 [1922].)
Accordingly, I sustain the defense based on a breach of the warranty of habitability and find on that ground for each of the respondents.
Turning to the defense based on section 302-a of the Multiple Dwelling Law, the evidence is clear that a rent-impairing violation affecting the entire building continued for over 6 months. As to one of the tenants, Barnett Brown, the rent demanded has been deposited in court so the defense as to him may be sustained without further discussion.
The other two respondents, not having tendered the rent demanded, challenge the requirement as unconstitutional.
In pertinent part the statute provides: “ 3. a. If (i) the official records of the department shall note that a rent impairing violation exists in respect to a multiple dwelling and that notice of such violation has been given by the department, by mail, to the owner last registered with the department and (ii) such note of the violation is not cancelled or removed of record within six months after the date of such notice of such violation, then for the period that such violation remains uncorrected after the expiration of said six months, no rent shall be recovered by any *23 owner for any premises in such multiple dwelling used by a resident thereof for human habitation r\ “ (c) to raise a defense under subparagraph a in any action to recover rent * * * the resident must also deposit with the clerk of the court * at the time of filing of the resident’s answer the amount of rent sought to be recovered in the action or upon which the proceeding to recover possession is based, to be held by the clerk of the court until final disposition of the action ’ ’.
Although involving a very different statute, the decision of the United States Supreme Court in Sniadach v. Family Finance Corp. (395 U. S. 337 [1969]) seems to me very much to the point. The Supreme Court there struck down as violative of procedural due process a Wisconsin statute that required an employer, upon service of a summons in a garnishment action, to withhold up to 50% of the employee’s wages, without any opportunity for the employee to be heard.
Even though the money would ultimately be released to the employee if he were successful, this was not deemed to cure the constitutional infirmity found in the temporary withholding of part of the wages without a hearing.
We are here concerned with rent money rather than wages, but the vice of the section under attack is the same, and indeed the circumstances taken as a whole seem to me rather more aggravated.
By preventing the tenant from asserting the defense until he has deposited the money demanded, the New York Legislature has effectively deprived tenants of the use of their own money for indefinite periods of time without any prior opportunity to be heard.
Three factors combine to make this condition wholly arbitrary and unreasonable, and a violation of procedural due process.
First, the tenant is required to deposit the very amount claimed by the landlord, without any provision for a hearing to insure that the demand is accurate. Thus if a landlord should demand several times the amount actually due, the tenant’s inability to deposit an exaggerated amount could preclude him from presenting an otherwise conclusive defense.
Second, no time limit is fixed for the landlord to commence proceedings subject to the defense. A landlord may choose to wait many months, or indeed years, putting the tenant under the burden of setting aside monthly reserves of money so that he might raise the defense when and if the proceeding were commenced. Surely this indefinite deprivation of the use of money, without any kind of hearing, cannot be reconciled with procedural *24 due process. (Cf. Midman Realty Corp. v. Kane, N. Y. L. J., Jan. 20,1971, p. 19, col. 4.)
Finally, the issue presented by the statute makes the requirement of deposit peculiarly unreasonable. For surely in most cases, as in this one, the official records of the appropriate agency will establish, at least presumptively, the validity or invalidity of the defense.
At the very least, a tenant should be permitted to present an official record establishing the violation, and its duration, in lieu of depositing the money. (Cf. Bell v. Tsintolas Realty Co., 430 F. 2d 474, 483-485.)
The section in question reminds me of an episode in Voltaire’s Zadig, subtitled “ An Oriental Fable ”, in which the hero was erroneously accused of having falsely denied that he had observed certain valued pets of the royal family. The novelist reports that according to the custom of that realm: They condemned Zadig to pay 400 ounces of gold for having said he had not seen what he had seen; first he had to pay the fine; after which Zadig was permitted to plead his cause before the Council of Destenham.
In sustaining the right of the nondepositing respondents to interpose the defense, I reach the same result as a matter of statutory construction under the special facts presented.
In this case the defense was interposed by one tenant who made the required deposit — and the evidence established a rent-impairing violation affecting each of the apartments.
I cannot believe that the Legislature intended to deprive the court of the power, under such circumstances, to apply that finding to other tenants, and I accordingly do apply it.
Finally I come to the counterclaim in which the tenants seek damages for violation of a warranty of quiet enjoyment and fitness for use. I am entirely satisfied that such a violation may indeed result in damages in excess of the rent sought. Putting to one side the damages arising from the crimes referred to, I do not believe that damages in excess of rent have been proved. And as to the criminal acts, I think that the issues involved in them, which were sought in part to be raised by the above counterclaim and in part by the post-trial motion to conform the pleadings to the proof should be resolved in a separate trial on the basis of new pleadings which permits resolution of all of the issues raised by that claim for damages.
Accordingly, judgments are to be entered dismissing the petitions here in all respects, with costs to the respondents.