Leonard H. -Sandier, J.
These 36 summary nonpayment proceedings were brought against a group of tenants in a large apartment building who joined together to withhold their rent in an effort to restore what -they considered an appropriate level of services. The apartment house in question, renovated in 1969, may fairly be described as middle-income in character. The rents are substantial, averaging in the neighborhood of $275 per month.
*33 The conditions disclosed by the evidence, whatever else may be said of them, do not present some of the more painful aspects so often found in the slum dwellings of the poor. Perhaps for that very reason, the case has an unusual significance, since it allows an analysis of the fundamental principles that govern or should govern the relationships between landlords and residential tenants in a comparatively unusual setting.
Three categories complaints may be discerned in the evidence.
First, there is a group of miscellaneous complaints, asserting in .nibstance that the superintendent was disturbingly inaccessible to the tenants and that the response to their legitimate requests for repairs was slow and inadequate. The evidence indeed confirms that the level of service was below that whidh would be reasonably expected in an apartment building of this character and charging the rents that prevailed. Nonetheless the failings disclosed in this aspect of the case do not seem to me sufficiently grave to permit any relief1 to the tenants in this litigation under the presently accepted rules of law.
If the housing market permitted these residential tenants any meaningful freedom of choice, the conditions revealed here would have inevitably led to an exodus of tenants to other apartment houses that give appropriate value for the rent received. In the absence of such a realistic opportunity, it is interesting and instructive that the joint action of the tenants, culminating in the rent strike, did evoke a serious effort by the landlord to improve the quality of service.
A second group of complaints pertains to elevator service. . The evidence does clearly suggest a greater than normal incidence of breakdowns as well as erratic performance on other occasions. However, the deficiencies in elevator service do not seem to me 'Sufficiently pervasive to sustain any relief under presently accepted rules of law.
Finally, and presenting the most legally significant questions in the case, the tenants allege a major violation by the landlord of its obligation to provide heat and hot water during the winter months.
As to this charge, the landlord conceded during the' trial that heat and hot water were not provided for a total of some 12 days during the winter months. The explanation advanced, undoubtedly accurate so far as it went, was that in the middle of December, a sidewalk cave-in damaged the boiler, which took almost two days to repair, and that toward the end of1 December, a more serious boiler breakdown required some five or six days to restore *34 it to operation. In addition, it appears that, during November, work on the boiler of a more familiar kind caused a brief interruption of service on several occasions.
The tenants, however, gave testimony that the failure to provide heat and hot water extended far beyond the limited period acknowledged by the landlord. The conflicting evidence on this question presents a perplexing factual issue.
The boiler in question operates automatically, and the landlord offered testimony by its employees that, except for the periods mentioned above, it worked properly. In addition, although there were repeated complaints by tenants to city agencies charging a lack of heat, some of which resulted in inspections, the records do not disclose any confirmation of the complaints apart from the conceded periods.
Nevertheless, several tenants who impressed me as absolutely trustworthy, testified unequivocally to a pervasive absence or inadequacy of heat during the winter months. Some tenants had been so incensed that they began in November to maintain daily records.
While there were some inconsistencies among tenants with regard to specific dates, and several tenants testified to a more extended period than did others, I am persuaded that there was in fact an absence of heat for a much longer time than acknowledged by the landlord or that could be accounted for by the breakdowns. .The exact number of days involved cannot be fixed with certainty, but a moderate estimate would place it at the equivalent of no less than two weeks in addition to the days not in dispute.
The testimony offered by the tenants as to lack of hot water for periods other than those conceded was more contradictory and less convincing, and I resolve that factual question in favor of the landlord.
In their answers to the petitions, each of the tenants interposed the defense of partial eviction, and also applied for the issuance of an order pursuant to section 755 of the Real Property Actions and Proceedings Law.
The defense of partial eviction must be dismissed since no evidence was submitted that any tenant abandoned an apartment, or any part of an apartment, as a result of the claimed conditions. (Barash v. Pennsylvania Term. Real Estate Corp., 26 N Y 2d 77 [1970].)
Nor does the record disclose conditions at the time of trial that would sustain the issuance of a section 755 order.
*35 However, as the trial proceeded, it became clear that a substantial legal issue was raised as to the availability to the tenants of a partial defense or setoff arising out of the apparent violation of the landlord’s covenants to provide hot water and heat during the winter months. A similar issue was presented as to the landlord’s possible breach of the implied warranty of habitability arising out of the apparent violation of section 75 of the Multiple Dwelling Law, requiring hot water, and section 79 requiring adequate heat. Since the attorneys for both sides were advised of the court’s concern with these issues, and there was no indication that the landlord was unprepared to meet them, I deem each of the answers amended to incorporate these defenses and setoffs.
Bach of the tenants in this proceeding had occupied their apartments under a printed-form lease, one of several such forms that regulate virtually all residential tenancies in this city. The unusual legal and social character of these instruments has only recently become the subject of critical judicial scrutiny. (Seabrook v. Commuter Housing Co., 72 Misc 2d. 6 [Civ. Ct. of City of . N. Y., 1972].)
From the most cursory examination of any of t)iese residential lease forms, it is immediately apparent that they have been carefully, painstakingly designed to provide maximum protection for the landlords and to give only the most grudging minimal recognition to the reasonable expectations of residential tenants. Not one of these widely used forms comes close to representing a fair bargain. And yet it is a simple statement of facts that most people cannot rent apartments in this city — cannot in fact live here — unless they sign one of these printed-form leases.
Several circumstances have combined to bring about this remarkable situation. As has already been observed judicially, few residential tenants retain lawyers in connection with signing leases, and the complex and legalistic language in which they are phrased discourages close study or understanding. (Seabrook v. Commuter Housing Co., supra.) More important, the housing shortage that has prevailed for most income groups for many years has given landlords an immense bargaining advantage which has been vigorously exploited in these form agreements. Finally, the organizational unity of landlords, coupled with the lack of effective communication between apartment seekers, has made any effort to change the terms of these forms by even the most sophisticated almost always aq exercise in futility.
*36 Obviously, these form leases fall within the familiar rule that any ambiguity in the language is to be resolved against the author. It is equally clear that these forms are studded with provisions which call for the unhesitating application of the doctrine of unconscionability when their terms bring about clearly unjust consequences. (See Seabrook v. Commuter Housing Co., supra; cf. Tai on Luck Corp. v. Cirota, 35 A D 2d 380 [1st Dept., 1970].)
Whether or not the profoundly coercive character of the circumstances under which residential form leases are signed requires the shaping of other remedial devices is an important question likely to become the subject of increasing judicial interest.
Fortunately, the leases in this case, although characteristically one-sided for the most part, are reasonably interpreted under the particular facts presented in a way that permits fair results.
Paragraph 10 of the leases provides in part “ That Landlord will furnish without additional charge, hot and cold water, heat during winter months only.” The quoted words are unconditional in character, and so far as read, represent a covenant clearly breached by the landlord even under its own limited version of the default.
The landlord seeks to escape liability on the basis of' the following words in the same paragraph: ‘ ‘ There shall be no allowance to the tenant for a diminution of rental value, and no liability on the part of the Landlord by reason of inconvenience or annoyance arising from the making of any repairs, alterations, additions, or improvements in or to any portion of the building or demised premises, or in or to fixtures or equipment.”
Obviously, this language has no conceivable application to the absence of heat for periods not linked with the repair of the boiler.
It is almost equally clear that the phrase cited by the landlord does not effectively avoid liability with regard to the periods during which the boiler was being repaired. The key words refer to “ annoyance ” or “ inconvenience ” during periods of repair. Nothing in the paragraph or lease as a whole avoids liability with regard to a disruption or absence of service — a very different circumstance — and I see no reason for stretching the carefully chosen language of the printed forms to extend still further the immunity of1 the landlord from legal responsibility. This does not, of course, mean that minor shutdowns in supplying heat and hot water caused by circumstances of a familiar kind, limited in duration and not frequently repeated, give rise to a setoff. *37 Residential tenants may fairly be deemed to have contracted with the understanding that at specific intervals work may be required on boilers that will involve temporary shutdowns of several hours to a day. It would make no sense at all to permit that kind of incident to become the subject of litigation over rent.
An absence of heat and hot water for 12 days during the winter months, as conceded by the landlord, presents a very different issue. Where so substantial a failure of services occurs, with regard to something explicitly promised by the landlord (and required by statute), I see no basis either in the terms of the lease or in basic principle why the tenants should be required to pay for that which they did not receive. And of course, as already stated, the record sustains the conclusion that there was an absence of heat for at least two additional weeks.
A further contention has been advanced by the landlord that in any event relief cannot be given the tenants in these proceedings because of the familiar lease provision that the tenant ‘ ‘ agrees ’ ’ in the event of a nonpayment summary proceeding, “ no setoff or counterclaim whatever of any nature will be interposed by or on behalf of the Tenant in any such * ® ® Special Proceeding.”
Undeniably, such provisions have been sustained as not contrary to public policy (Orlowsky v. East House Enterprises, 32 Misc 2d 664 [App. Term, 1st Dept., 1961]; Linker v. Herard, 13 Misc 2d 445 [App. Term, 2d Dept., 1958] ; Amazon Mgt. Corp. v. Paff, 166 Misc. 438 [App. Term, 2d Dept., 1938]), notwithstanding their flat contravention of the clear policy of the law against circuity of actions and in favor of the disposition of all related issues in a single litigation. (Real Property Actions and Proceedings Law, § 743; OPLR 3011, 3019,1007 et seg.; cf. Janks v. Central City Roofing Co., 271 App. Div. 545 [4th Dept., 1947]; 240 W. 37th St. v. Lippman, 241 App. Div. 529 [1st Dept., 1934].) Although the principle sustaining such lease provisions was adopted at a time when the intimate interrelationship between the landlord’s right to receive rent and his duty to provide services had not received judicial recognition, and should be reviewed in the light of the currently developing law, it obviously remains authoritative on the general issue.
However, a sharply distinguishing circumstance is present here which quite plainly requires a different result. These tenants, obviously acting in good faith, had sought a section 755 order, and the consideration of that application required the court to hear all the evidence relevant to the question of a setófí. To relegate the tenants to a separate action at which precisely *38 the same evidence would be heard would involve the court in an indefensibly wasteful and time-consuming procedure. Nothing in the earlier cases requires, the court to follow such a dubious course or to accept such an unnecessary burden.
There remains for decision the difficult problem of determining the amount of setoff to the rent to which these tenants are entitled.
Preliminarily, I am persuaded that the court may make this determination without requiring expert testimony, which in fact was not introduced by either side in this case.
The economic realities of proceedings involving residential tenants make it unlikely that such testimony would be readily available to tenants in the usual case.
Moreover, I seriously doubt that statistical information about the value of apartments operated in violation of law is available in a form that permits meaningful expert testimony.
Under the circumstances presented, it is the clear responsibility of the court to determine the value of the services of which the tenants were deprived and the extent and duration of the deprivation in relation to the worth of the entire apartment, and form a practical judgment as to the amount by which the value of the apartment had been reduced. A basic rule of damage, particularly appropriate in this kind of situation, is that where damage has in fact been unjustifiably sustained, all relief should not be denied because it is not possible to fix with certainty the precise value of the damage. (5 Corbin on Contracts, § 1020.)
These tenants were denied hot water for 12 days, and heat for a period of some four weeks during the winter.
I have concluded that a one-week setoff- against the rent for each of these tenants would fairly approximate the damage suffered.
The result reached above on the basis of the lease provisions would be independently required under the developing doctrine of implied warranty of habitability, at least with regard to the period not connected with the repair of the boiler. The Multiple Dwelling Law, expressing the public policy of the State, mandates that landlords must provide hot water throughout the year (§ 75) and heat during the appropriate time of the year (§ 79).
The rule, accepted until recently, that separated the landlords’ right to rent from their duty to provide services as required by law, has been thoroughly sapped of vitality. (Javins v. First Nat. Realty Corp., 428 F. 2d 1071 [D. C. Cir., 1970], cert. den. 400 U. S. 925 [1970] ; Marini v. Ireland, 56 N. J. 130 [1970]; Boston Housing Auth. v. Hemingway, 41 U. S. Law Week 2518 [Mass., 1973]; Amanuensis Ltd. v. Brown, 65 Misc 2d 15 [Civ. *39 Ct. of City of N. Y., N. Y. County, 1971]; Morbeth Realty Corp. v. Rosenshine, 67 Misc 2d 325 [Civ. Ct. of City of N. Y., N. Y. County, 1971]; 40 ALR 3d 646 [1971]; cf. 57 E. 54 Realty Corp. v. Gay Nineties Corp., 71 Misc 2d 353 [App. Term, 1st Dept., 1972].) The product of a peculiar complex of historical circumstances, it is obviously inappropriate to contemporary urban realities, and is utterly discordant with the almost universal rule in our society that is based upon the interdependence of rights and duties. (See, e.g., Javins v. First Nat. Realty Corp., suyra; Quinn & Phillips Law of Landlord-Tenant: a Critical Evaluation of the Past with Guidelines for the Future, 38 Fordham L. Rev. 225 [1969]; Proposed Model Residential Landlord-Tenant Code, Comment to § 1.102.)
The remaining issues do not require extended discussion. The two counterclaims interposed — one seeking return of security deposits and the second seeking recovery of legal fees and expenses are both denied.
The evidence does not establish a violation of section 7-103 of the General Obligations Law with regard to security deposits. Nor do the leases in question make the kind of provision for recovery of legal fees and expenses by the landlord that would sustain a recovery by the tenants under section 234 of the Real Property Law, even assuming that the tenants here were “ successful ’ ’ within the meaning of that section.
Finally the motions to dismiss several of1 the petitions on the basis of Giannini v. Stuart (6 A D 2d 418 [1st Dept. 1958]) are also denied. Under all of the circumstances of this multiparty litigation, the Giannini doctrine does not seem to me applicable.
In view of the large number of petitions involved and other complicating circumstances, the order should be settled on notice tinless the parties can independently agree on an order.