PARK WEST MANAGEMENT CORP., Appellant, v ARTHUR MIT-
CHELL et al., Respondents.

First Department, May 2, 1978

## APPEARANCES OF COUNSEL

*Eugene J. Morris* of counsel (*Michael J. Dezorett* with him on the brief; *Demov, Morris, Levin & Shein,* attorneys), for appellant.

*Kent Karlsson* for respondents.

*William F. Treanor* (*Mendes Hershman* and *Douglas N. Cordon* with him on the brief), attorney for the Real Estate Board of New York, Inc., *amicus curiae.*

*Proskauer Rose Goetz & Mendelsohn (Howard Lichtenstein,*

*Marvin Dicker* and *Abraham Borenstein* of counsel), attorneys for Realty Advisory Board on Labor Relations, Inc., *amicus curiae.*

*Berger, Kramer & Sugerman (Robert Sugerman* of counsel), attorneys for Ad Hoc Committee to Defend the Warranty of Habitability Law, *amicus curiae.*

*John E. Kirklin (Kalman Finkel, Morton B. Dicker, Gary R. Connor* and *Susan Seel* with him on the brief), attorney for the Legal Aid Society of New York City, *amicus curiae.*

*Louis B. York (Peter M. Wendt* and *Nancy E. Le Blanc* with him on the brief), attorney for Manhattan Legal Services Corporation and another, *amici curiae.*

*Lindenbaum & Young (Abraham M. Lindenbaum* of counsel), attorneys for Rent Stabilization Association of New York City, Inc., *amicus curiae.*

## OPINION OF THE COURT

SANDLER J.

In this nonpayment summary proceeding, petitioner landlord, Park West Management Corporation, appeals by leave of this court from an order of the Appellate Term, which affirmed a judgment of the Civil Court, New York County, granting tenants a 10% rent abatement on a counterclaim for an alleged breach of the warranty of habitability.

In the aftermath of the 17-day strike of building employees during May, 1976, tenants of seven large apartment buildings, known as Park West Village, withheld their rent for the month of June. Summary nonpayment proceedings were thereupon instituted in which the tenants raised the affirmative defense that the landlord had not provided essential services and thereby had breached the warranty of habitability.

It was agreed by stipulation that the decision to be rendered in the instant proceeding would bind some 400 tenants of the Park West Village apartments. It was also stipulated that the facts would be presented by way of written statements of both parties describing the circumstances and effects of the strike.

After a review of the written submissions, the hearing officer concluded that there had been an interruption (apparently extensive) of garbage removal and janitorial services, as well as a "limited number of service interruptions," and held

that these constituted a breach of the warranty of habitability.

Relying in part on a formula developed by the Department of Rent and Housing Maintenance for controlled apartments, he determined that the loss in the rental value of the apartments sustained by the tenants justified a 10% setoff in their June rent bill.

In affirming, the Appellate Term noted that the formula in question was properly taken into consideration, but "may not be used as a substitute for an assessment of the damages established by the record." However, the Appellate Term concluded that the record itself supported the ultimate finding.

This appeal requires this court for the first time to interpret and apply section 235-b of the Real Property Law enacted into law in 1975 (L 1975, ch 597).

Section 235-b, as originally enacted, provided:

"1. In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. When any such condition has been caused by the misconduct of the tenant or lessee or persons under his direction or control, it shall not constitute a breach of such covenants and warranties.

"2. Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy."

In 1976, the Legislature added subdivision 3: "3. In determining the amount of damages sustained by a tenant as a result of a breach of the warranty set forth in this section, the court need not require any expert testimony."

The purpose of section 235-b was succinctly set forth in an authoritative statement on June 17, 1975 by Senator Barclay, its Senate sponsor: "The contractual relationship between the two parties will be changed to put the tenant in parity legally with the landlord." (1975 Sen J, pp 7766-7776.) Noting the development of the implied warranty of habitability in judicial

decisions, Senator Barclay went on to say: "We will confirm the direction that the courts have been taking toward dealing with the question on the basis of contract law."

The decisions referred to in his statement reflected the increasing judgment of courts concerned with landlord-tenant proceedings that rules developed in an earlier era did not yield sensible or just results when applied to the realities of contemporary apartment living, and that the right of the landlord to receive rent (obviously of critical importance) had somehow become separated from and given preference to the right of tenants to live in apartments maintained decently and in accordance with requirements of law. (See, e.g., *Amanuensis, Ltd. v Brown,* 65 Misc 2d 15; *Morbeth Realty Corp. v Rosenshine,* 67 Misc 2d 325; *Mannie Joseph, Inc. v Stewart,* 71 Misc 2d 160; *Tonetti v Penati,* 48 AD2d 25; *57 E. 54 Realty Corp. v Gay Nineties Realty Corp.,* 71 Misc 2d 353. See, also, *Javins v First Nat. Realty Corp.,* 428 F2d 1071; *Marini v Ireland,* 56 NJ 130; *Pines v Perssion,* 14 Wis 2d 590.)

■ Preliminarily we are satisfied that the record adequately supports the finding of the hearing officer that there had been a breach of the "covenant and warrant" deemed by section 235-b to be part of every "written or oral lease or rental agreement for residential purposes." A substantial deprivation of garbage disposal, janitorial and repair services for a 17-day period clearly involves the creation of conditions "dangerous, hazardous or detrimental to * * * life, health or safety."

The most far-reaching of the arguments advanced by petitioner, repeated in several different forms, is that section 235-b was not intended to apply to conditions that resulted from events beyond the control of the landlord and implying no culpability on the landlord's part. Whether or not the strike may be so classified, which we doubt, the suggested interpretation does not seem to us tenable in the sweeping form presented.

It is true that many of the court decisions that shaped the doctrine of the implied warranty of habitability were influenced by judicial concern for the deplorable conditions shown to have occurred where a small number of landlords callously disregarded their responsibilities. An equally significant factor, however, was a sense of injustice in requiring tenants, deprived of services essential to decent living, to pay for that which they did not receive. (See, e.g., *Steinberg v Carreras,* 74

Misc 2d 32, mod on other grounds 77 Misc 2d 774; cf. *Matter of Concord Realty Co. v City of New York,* 30 NY2d 308, 314.)

Petitioner's interpretation would require a tenant to pay the entire stipulated rent where the landlord has been unable to discharge its obligations under section 235-b through no fault of either the landlord or the tenant, and conditions detrimental to "life, health or safety" have resulted. The statutory language "covenant and warrant" has far too well established a meaning in our law to be reconciled with this view.

■ Like all general principles, the one here advanced may require qualification in the light of on-going experience. If, for example, a landlord at considerable expense did all that might reasonably be done to respond to conditions that developed from events truly beyond his control, a fair and realistic accommodation of the legitimate interests of both parties might suggest another approach.

For reasons similar to those stated above (and with a similar caution), it is clear that the requirements of section 235-b may not be qualified or eliminated by lease provisions of a familiar kind that excuse the landlord's performance of his obligations "by reason of any cause beyond Landlord's reasonable control." Subdivision 2 of section 235-b explicitly voids as contrary to public policy "any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section".

■ The suggested analogy to *force majeure* provisions in commercial agreements is plainly inapposite here. Such provisions have been upheld to excuse the performance of a party under prescribed circumstances. They have not, however, been interpreted to permit the party excused from performance to receive compensation for that which he was unable to do, which would be the effective result of the application of that principle here.

■ The further argument that the section should be deemed inapplicable to provisions in leases signed prior to the enactment of the law also lacks merit. The section was unmistakably designed to codify and confirm a body of case law already in existence.

■ Nor do we find any support for the contention that section 235-b should be deemed inapplicable with regard to rent-controlled or rent-stabilized apartment buildings. Nothing in the legislative history of the section suggests such a drastic

limitation on its effective application, nor is there anything in its language that provides the slightest basis for that view. The cases intended to be codified invariably involved rent-controlled apartments, a fact surely known to the Legislature when the section was enacted. And, of course, it was the decision of petitioner to commence the summary nonpayment proceedings in the Housing Part of the Civil Court that inevitably resulted in the issue being litigated in that forum.

■ As to the 10% setoff awarded by the hearing officer, we are in agreement that the record adequately supports that determination. As to the general question of damages in such proceedings, an additional comment may be appropriate.

■ It is obvious that the determination of the setoff to be allowed a tenant where a breach of section 235-b is established will often present problems of some difficulty. Mathematical certainty is not here to be expected. This fact was clearly appreciated by the authors of the bill who quite purposefully drafted it "to leave the greatest degree of flexibility to the courts to fashion an appropriate remedy in each case." (Statement of Senator Barclay, June 17, 1975.)

In that same statement, Senator Barclay went on to say:

"Since we are treating a lease or rental agreement for residential premises as a contract, the full range of remedies in contract law could be considered by a court * * * These include damages, specific performance, and rescission * * *

"The most frequently applied measure of damages is likely to be the decrease in rental value caused by the breach * * * This remedy closely parallels the rent reductions granted administratively under rent control for failure to maintain essential services * * * Courts should be able to continue to apply generalized rules-of-thumb for determining the proportionate abatement appropriate for various types of breaches without having to resort to expert testimony."

No useful purpose would be served by detailing here at length approaches that might be suitable in widely varying factual situations. Formulas developed in analogous situations by specialized administrative agencies may appropriately be considered by the fact finder. Inevitably the issue will often require testimony by the tenants affected not only as to their factual observations but also as to the impact of the conditions described on their daily living.

That this possibility was contemplated by the Legislature is

clear. Subdivision 3, adopted in 1976, explicitly provided that "the court need not require any expert testimony." Testimony as to value by nonexpert witnesses in certain situations is, of course, no novelty in our law. (See Richardson, Evidence [10th ed], § 364; cf. *Hangen v Hachemeister,* 114 NY 566; *Cutler-Hammer, Inc. v Troy,* 283 App Div 123.)

The controlling principle was long ago stated by the Court of Appeals: "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach." *(Wakeman v Wheeler & Wilson Mfg. Co.,* 101 NY 205, 209. See, also, 5 Corbin, Contracts, § 1020.)

For the reasons stated, the order of the Appellate Term, entered June 23, 1977, affirming the judgment of the Civil Court, New York County (Hearing Officer Nason), should be affirmed, without costs.

LUPIANO, J. P., LANE and MARKEWICH, JJ., concur.

Order, Appellate Term, First Department, entered on June 23, 1977, unanimously affirmed, without costs and without disbursements.