Margaret MINTON, Appellant,

v.

Donald G. HARDINGER, Respondent.

No. 53669.

Supreme Court of Missouri, Division No. 1.

Dec. 9, 1968.

Modified on Courts own Motion and Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 15, 1969.

2. Subparagraph (f) of S.Ct. Rule 27.26, V.A.M.R.

**4**

E. J. Murphy, Butler, for appellant.

R. S. McKenzie, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for defendant-respondent.

SEILER, Judge.

This case involves the question of whether the landlord of a furnished upstairs apartment leased for immediate occupancy for a month's term is liable for injuries to the tenant received from an explosion caused by gas leaking from a defective valve connection or coupling near the bathroom heater.

Mr. and Mrs. Minton, a young married couple with a baby, rented a furnished apartment at 302 West Pine, Butler, Missouri, from the defendant for $35.00 per month. The apartment consisted of three rooms and a bath. It occupied the second floor of a two story house and was reached by an outside stairway. There was a larger apartment on the first floor, occupied by other tenants.

The defendant, who rented other apartments in Butler as well as this one, furnished the furniture, beds, lamps, refrigerator, cooking stove, hot water heater, a gas wall heater in the living room, and a small gas heater in the bathroom. The bathroom heater was attached to a gas outlet or riser coming up through the bathroom floor next to the baseboard, by means of a rubber hose two or three feet long. There were clamps at each end of the hose. The flow of gas was controlled by two hand-operated cocks or valves, one at the top of the riser just ahead of the rubber tube attachment and the other on the gas heater, just behind the attachment of the tube to the heater inlet.

The Mintons paid the first month's rent in advance on October 29, 1966. They moved some of their belongings into the apartment on October 30, and left a note at the defendant's home with checks in payment of the utilities—gas, water, and light—asking the defendant to have the utilities turned on for them. The Mintons then returned to Boonville, Missouri, where they had been living and did not return to Butler for another week.

Defendant retained a key to the apartment, for the reason, he said, that he thereby would not have to break the lock after a tenant had vacated the premises. When defendant saw the note from the Mintons, he unlocked the apartment so the utilities could be turned on, took the checks to the utilities office and arranged for the utilities to be turned on in the Minton's name. Defendant's tenants paid for their own utilities, which were metered to them through separate outside meters.[1] Defendant returned to the apartment to see that the utilities had been turned on and then relocked the door.[2] He did not check for gas leaks in the apartment.

The Mintons moved into the apartment about November 6, 1966. The first evening, the husband, Ron Minton, lighted the bathroom heater but "the fumes were so bad he had to turn it right back off again." He told Mrs. Minton to report the gas leak to the defendant. Mrs. Minton said she told the defendant the next day that "the little heater in the bathroom leaked" and "needed to be fixed", to which defendant made no response other than to get up from the table where he and his wife were having lunch and say that he had to go to work.

1. The gas line to the upstairs apartment went from the outside meter into the side of the house a few feet above the ground and disappeared until it reappeared in the floor of the bathroom upstairs.

2. The gas company's records showed that on November 1, 1966, they lighted the water heater and the heating stove.

The weather was warm during most of the time the Mintons occupied the apartment, but one day was cold and Mrs. Minton lighted the bathroom heater. She smelled fumes and "couldn't leave it on long". She told her husband about this and he told her not to light it anymore. Nothing further was done about the gas leak by anyone and the heater was not lighted again. From time to time the Mintons would smell gas in the bathroom, particularly when coming in from the outside. On November 26, 1966, Mr. Minton, after having retired for the night noticed the odor of gas in the apartment. He got up to investigate, turned on the light in the bathroom and the gas exploded, causing burns from which he died on December 17, 1966. Mrs. Minton testified she was cleaning the bathroom earlier the day of the explosion and smelled gas. She was "pretty sure" she looked at the time to be sure both valves were turned off, but she did not know whether at the time of the explosion or afterwards the floor valve was open.

Another couple, the Laffoons, occupied the apartment for three months shortly prior to the Minton's occupancy. The Laffoons had noticed an odor of gas "for a while and it began to get worse" and on about September 14, 1966, they reported this to defendant's wife, who admittedly was his agent as to the apartment. A few days before the Laffoons vacated the apartment, around October 14, Mr. Laffoon lighted the gas heater on a chilly night. The fumes "were extremely bad" and he turned the heater off. That evening he decided to check the heater with a match flame. The valve next to the heater had no leak, but there was enough "seepage" around the floor next to the other valve that with both valves turned off, a flame the size of a small pilot light burned near the riser. His wife described this as "a flame around the bottom of the hose." Laffoon also testified the screw was missing from one of the clamps. Plaintiff testified her husband said something to her "about a screw being missing".

The defendant and his wife denied any report from the Mintons or the Laffoons about a gas leak, although he said tenants would frequently report complaints to his wife, who would tell him. Defendant said that if a gas leak were reported to him by tenants the normal procedure would be for him to call the gas company,[3] although he had on occasion soaped gas lines in some of his apartments to see if there was a leak, but he had never done so in the Minton's apartment. He testified that he expected his tenants to take care of the appliances in the apartment, but said that if an appliance broke down, "in the long run" he would have to "fix them up". He personally checked the gas connection in the bathroom after the explosion and fixed it by installing a metal connection instead of a rubber hose to the heater.

Mrs. Minton sued for the death of her husband and received a $25,000 verdict and judgment. She sued on the theory that defendant was negligent "in maintaining a defective valve connection in the gas system in the apartment rented" to the Mintons. The case was submitted to the jury by plaintiff on an instruction reading as follows:

"Your verdict must be for plaintiff if you believe:

"First, there was a defective valve connection in the gas system and as a result the gas system was not reasonably safe and,

3. This probably would have caused the gas supply to be shut off (a result which would indicate that defendant retained sufficient control over the apartment and its gas appliances so as to bring about a cutting off of gas service) because the gas company, upon receipt of notice of a leak in the customer's appliances, would be under a duty to shut off the supply of gas until such time as the owner of the defective pipes or appliances had corrected the condition, Barrickman v. National Utilities Co., Mo.App., 191 S.W.2d 265, 268; Gas Service Co. v. London & Lancashire Ins. Co. (C.C.A.8), 188 F.2d 404, 409. This would not, of course, relieve defendant from any obligation he had to correct the defect permitting the escape of gas on his premises.

"Second, the gas system was in the possession and control of defendant and was used by tenants of defendant with his consent, and

"Third, defendant knew, or by using reasonable care should have known, of this condition and

"Fourth, defendant failed to use ordinary care to make the gas system reasonably safe, and

"Fifth, defendant was thereby negligent, and

"Sixth, as a direct result of such negligence, Ronnie Minton died, unless you believe plaintff is not entitled to recover by reason of Instruction No. 5." [4]

In response to defendant's after-trial motion the trial court set the judgment aside and entered judgment for defendant in accordance with defendant's motion for judgment at the close of evidence, bottomed primarily on the contention that defendant had no control or right of control over the gas system or the heater connections. Plaintiff appeals.

Neither side has cited, nor have we found, a Missouri case involving a furnished apartment with facts similar to the present case. Defendant would dispose of this case on the basis that a landlord is not liable to a tenant for injuries caused by a dangerous condition which existed at the time the tenant took possession under a lease, or which came into existence thereafter, "because a lease is regarded as equivalent to a sale of the premises for the term", except for certain exceptions which defendant says are not involved here. Defendant also contends there was no retention by him of any control for the purpose of repair sufficient to hold him under the usual landlord-tenant rules.

We cannot accept the assumption basic to defendant's contentions—namely, that what existed between the parties here was the kind of lease that could properly be regarded as equivalent to a sale of the premises for the term. What is involved here is a one-month, short-term, oral letting of a furnished apartment for immediate occupancy by a family of three. The Mintons had the right to use the second floor, consisting of three rooms and a bath, of a two story frame house, with an outside stairway as their means of ingress and egress, and also had the right to use certain personal property and appliances furnished by the landlord, including appliances for heating the apartment with gas which they were to pay for. This cannot fairly be regarded as a traditional lease of real estate, carrying with it whatever improvements were situate thereon. On the contrary, it was nothing but the short-term letting of the upstairs portion of a house, which could be leased separately and independently of the downstairs portion already occupied by others, along with the furnishing of what furniture, appliances and connections were necessary for immediate habitation by the tenants, without delay and without the expense to the tenants of preparing it for use, save only that the tenants were to pay for the utilities used. It was a letting of the space on the second floor and a concurrent bailment to the Mintons of the furniture and appliances.

With property of the type and class here involved frequent relettings would occur. On the record before us it was rented for short periods of time. The defendant acknowledged that ultimately it was up to him to fix the appliances if they needed repair. The fact is that unless repairs were made by him they would not be made by anyone. It would be unrealistic of the defendant to ex-

---

4. Instruction No. 5 was defendant's instruction on contributory negligence. It directed a verdict for defendant if plaintiff or her husband knew the gas heater or the connection to it leaked, if permitting the leak to continue was negligent, and if such negligence were related proximately to the death. This issue was resolved in favor of plaintiff by the jury's verdict and no contention is made that plaintiff or her husband were guilty of contributory negligence as a matter of law.

pect otherwise. That it was the letting of a furnished apartment shows it was not intended on either side to take a lease which would involve the necessity on the part of the tenants of alterations or repairs of the space occupied or the appliances furnished. To render the renting of the apartment, furnished for immediate occupancy, of any practicable value to the Mintons, they needed appliances which were reasonably safe, or which the landlord would make so upon notice, for which purpose he would have an implied concomitant right of reasonable access to the premises.[5]

The situation existing in the Minton apartment was one which some care and no great expense by the landlord would have corrected. It is said in American Law of Property, Vol. I, § 3.78, pp. 347–48, "The rule that the tenant must make repairs was probably fair when applied in an agrarian economy where the materials for repairs were simple and at hand, and the tenant capable of making them himself. At least as concerns the actual making of repairs, the rule seems archaic and completely out of harmony with the facts when applied in a complicated society to urban dwellings occupied by persons on salary or weekly wage. Common experience indicates that the tenant in such cases seldom makes or is expected to make repairs even of the minor type covered by the common law duty * * * It would seem that the lessor is in the better position, from the viewpoint of economic situation and interest, to make repairs, and that the tenant ought to have no duty in the absence of a specific covenant."

Although the Mintons were to pay for the gas they used, they by no means had control or right of control over the house lines running from the customer's side of the gas meter into the wall of the house and upstairs to the second floor, or the connection of the gas heater to the gas line. The right of control over these remained in the landlord. It is not reasonable to say that the occupancy of the second floor and the use of the heating appliances carried with it control over the house gas lines or connections. The Mintons actually had possession of nothing more than the rooms of their apartment and the use of the appliances, with the landlord controlling everything else. Here, as in Green v. Kahn (Mo.Sup.), 391 S.W.2d 269, the Mintons had the use, but not the control, of the bathroom gas heater and its connections. There is no reason to suppose that the Mintons had the right, without the consent of the landlord, to change the connection of the gas heater to the riser by substituting a copper tubing for the rubber hose, as the defendant chose to do after the explosion (this would involve a change in the conduit for the passage of gas and unless material and workmanship used were sound could be disastrous) anymore than they would have had the right to make changes in the electrical wiring or electrical connections in the apartment without his consent. The tenancy which existed here gave the Mintons no control or right of control over such matters.

Under the facts before us, we believe the rule as stated in Gladden v. Walker & Dunlop, Inc., 83 U.S.App.D.C. 224, 168 F.2d 321, 322, is sound, " * * * With regard to plumbing and heating systems, the principle extends to operative fixtures in the apartments leased to tenants and operation through them. * * * Plumbing, heating and electrical fixtures are not isolated either in use or maintenance. They must be maintained and used, if at all, in conjunction with the systems of which they are parts. Accordingly the tenant who uses them is usually not expected to maintain them, but only to notify the landlord when they appear to be out of order. * * * The law should follow custom and convenience in classifying such fixtures among the things that the landlord controls."

5. When the Mintons rented the apartment October 29 and moved some of their belongings in on October 30, the gas had not yet been turned on at the meter and so they could not then have checked for a gas leak. When they did discover the leak on November 6, they gave the landlord prompt notice.

We hold therefore that there was a basis in law and in fact for the submission to the jury of plaintiff's case as set out in the instruction quoted above and that the court erred in setting aside the verdict and judgment and entering judgment for defendant.

The judgment is reversed and the cause remanded with instructions to the trial court to reinstate the verdict and judgment for plaintiff as of its original date.

All of the Judges concur.