# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 4, 2002 Session

## PHILIP WORKMAN v. DONAL CAMPBELL, ET AL.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 01-966-III     The Honorable Ellen Hobbs Lyle, Judge**

---

**No. M2001-01445-COA-R3-CV - Filed May 7, 2002**

---

This case involves the extent to which the State of Tennessee may regulate a condemned prisoner's right to be attended by his personal minister in the hours leading up to his execution. Prisoner sued the Commissioner of the Tennessee Department of Corrections and the prison warden based upon the warden's denial of prisoner's request that his personal religious advisor be physically present at all times leading up to his execution. The chancery court ordered the issuance of a writ of mandamus requiring the prison warden to allow the prisoner's minister to attend the prisoner at all times until the prisoner enters the death chamber. We reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Paul G. Summers, Attorney General, Michael E. Moore, Solicitor General, Mark A. Hudson, Senior Counsel, For Defendants-Appellants, Donal Campbell, et al

Louis W. Oliver, III, Hendersonville, For Plaintiff-Appellee, Philip Workman

### OPINION

Before his scheduled execution on March 30, 2001 at 1:00 a.m.[1], Plaintiff/Appellee Philip Workman ("Mr. Workman") requested that his personal minister, Reverend Joseph B. Ingle ("Reverend Ingle"), be permitted to be physically present with him at all times leading up to his execution. Ricky Bell ("Warden Bell" or "Warden"), the prison warden, refused to allow Reverend

---

[1]The Tennessee Supreme Court issued a stay of execution shortly before Mr. Workman's execution was to be carried out.

Ingle to remain with Mr. Workman after 10:00 p.m., on March 29, 2001, citing security concerns as the reason for his denial of Mr. Workman's request.

On March 28, 2001, Mr. Workman filed suit against Donal Campbell, Commissioner of the Tennessee Department of Corrections ("TDOC") and Warden Bell. In his Complaint, Mr. Workman alleged that the Warden's denial constituted "unusual and unreasonable punishment" under the United States Constitution, a denial of his religious freedom, and that the denial was "arbitrary and unfounded in law or fact." A hearing was held on March 29, 2000, and following the hearing, the Chancellor entered an Order granting the relief sought. The Order provides in part:

> After considering the papers filed in support of and in opposition to the application, and argument of counsel, the Court holds that Tennessee Code Annotated section 40-23-116(a)(3) recognizes the right of a condemned person to be attended by his personal minister until the time the condemned person enters the death chamber. The statute makes it the duty of the Warden to afford the condemned person this right. The policy being enforced by Warden Bell violates that right. Accordingly, the Court under the legal authority of a writ of mandamus, commands Warden Ricky Bell and the Tennessee Department of Correction to allow Joe Ingle, the inmate's minister of the gospel who has been preparing the inmate for death, to remain with the inmate until the inmate enters the death chamber. The Court's reasoning is as follows.

> Tennessee Code Annotated section 40-23-116 is the Legislature's commandment on how an execution shall proceed. The statute provides the following:

> (1) In the first instance, the sheriff transports the condemned person from the county to the state penitentiary where the death chamber is located.
> (2) The Warden is charged by the Legislature with carrying out the death sentence in a secluded and private death chamber.
> (3) The Legislature has particularly designated limited persons who may witness the execution.
> (4) One of those witnesses is a priest or minister of the gospel "who has been preparing the condemned person for death [emphasis added]."

> By using the particular wording the minister "who has been preparing the condemned person for death," the Legislature contemplated that the condemned person would be attended in his

final hours by a minister who has a personal relationship with the condemned person and who has been preparing the person for the execution. The only restriction the Legislature placed on the personal minister's attendance of the condemned person is when the condemned person enters the death chamber ("the Warden of the state penitentiary in which the death chamber is located shall cause such death sentence to be carried out within an enclosure. . . in strict seclusion and privacy [emphasis added]." Tenn. Code Ann. § 40-23-116(a).

The Court, therefore, concludes, first, that Tennessee Code Annotated section 40-23-116(a)(3) accords the condemned person a right to be attended not just by a minister on the prison staff who has no relationship with the condemned person but with a "minister of the gospel who has been preparing the condemned person for death." Secondly, the only restriction the statute places on that right of attendance is that the condemned person shall be alone in the death chamber. Thus, Warden Bell's policy of requiring the personal minister to vacate the death cell at 10:00 p.m. infringes on the right accorded the condemned person by the Legislature to have a personal minister in attendance.

Additionally, of some note is that the State has admitted that the State performs no preparation no conducts any activity with respect to the condemned person from 10:00 p.m. through 12:00 a.m. The State has also admitted that the Reverend Joe Ingle has never threatened or breached security in his many prison visits.

It is therefore ORDERED that the Court, pursuant to a writ of mandamus, commands the Tennessee Department of Correction and Warden Ricky Bell to carry out the dictate of the Tennessee Legislature that a condemned person be permitted to prepare for death with the attendance of his personal minister, in this case the Reverend Joe Ingle, and that the Tennessee Department of Correction and Warden Ricky Bell are enjoined from ejecting Reverend Joe Ingle from attendance until such time as the condemned person enters the death chamber. Pursuant to Tennessee Code Annotated section 40-23-116 the Reverend Joe Ingle is not permitted in the death chamber.

On April 25, 2001, Defendants filed a Motion to Reconsider or Alternatively to Alter or Amend the Judgment, which the Chancellor denied on June 6, 2001.

Defendants Campbell and Bell ("Defendants") have appealed, and present the following three issues for review, as stated in their brief: (1) Whether the chancery court erred in issuing a writ of mandamus where T.C.A. § 40-23-116(a)(3) does not impose a nondiscretionary, ministerial duty; (2) Whether the chancery court erred in finding that T.C.A. § 40-23-116(a)(3) gives a condemned inmate the right to be attended by his personal minister until the time the inmate enters the death chamber; and (3) Whether the decision to restrict religious visits with the condemned inmate after 10:00 p.m. prior to the execution is not arbitrary or otherwise improper.

We first address the second issue, whether the statute in question, T.C.A. § 40-23-116, provides Mr. Workman the right to have his personal minister attend him at all times leading up to his scheduled execution.

T.C.A. § 40-23-116 provides, in its entirety:

### § 40-23-116. Capital punishment; procedure; witnesses

(a) In all cases in which the sentence of death has been passed upon any person by the courts of this state, it is the duty of the sheriff of the county in which such sentence of death has been passed to remove the person so sentenced to death from such county to the state penitentiary in which the death chamber is located, within a reasonable time before the date fixed for the execution of the death sentence in the judgment and mandate of the court pronouncing the same. On the date fixed for such execution in the judgment and mandate of the court, the warden of the state penitentiary in which the death chamber is located shall cause such death sentence to be carried out within an enclosure to be prepared for that purpose in strict seclusion and privacy. *The only witnesses entitled to be present at the carrying out of such death sentence are:*

(1) The warden of the state penitentiary or the warden's duly authorized deputy;
(2) The sheriff of the county in which the crime was committed;
*(3) A priest or minister of the gospel who has been preparing the condemned person for death;*
(4) The prison physician;
(5) Such attendants chosen and selected by the warden of the state penitentiary as may be necessary to properly carry out the execution of the death sentence;
(6) A total of seven (7) members of the print, radio and television news media selected in accordance with the rules and regulations promulgated by the department of correction. Those news

-4-

media members allowed to attend any execution of a sentence of death shall make available coverage of such execution to other news media members not selected to attend; and

(7) Immediate family members of the victim who are eighteen (18) years of age or older. Such immediate family members shall include the spouse, child (by birth or adoption), stepchild, stepparent, parent, grandparent or sibling of the victim; provided, that members of the family of the condemned prisoner may be present and witness the execution.

(8) One (1) defense counsel chosen by the condemned person; and

(9) The attorney general and reporter, or the attorney general and reporter's designee.

(b) No other person or persons than those mentioned in subsection (a) are allowed or permitted to be present at the carrying out of the death sentence. It is a Class C misdemeanor for the warden of the state penitentiary to permit any other person or persons than those provided for in subsection (a) to be present at such legal execution.

(c)(1) Photographic or recording equipment shall not be permitted at the execution site until the execution is completed, the body is removed, and the site has been restored to an orderly condition. However, the physical arrangement of the execution site shall not be disturbed.

(2) A violation of subdivision (c)(1) is a Class A misdemeanor.

(3) The department shall promulgate rules that establish criteria for the selection of news media representatives to attend an execution of a death sentence in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. In promulgating such rules, the department shall solicit recommendations from the Tennessee Press Association, the Tennessee Associated Press Managing Editors, and the Tennessee Association of Broadcasters. For each execution of a death sentence, applications for attendance shall be accepted by the department. When the number of applications require, lots to select news media representatives will then be drawn by the warden of the state penitentiary at which such death sentence is to be carried out. All

such drawings shall be conducted in open meetings and notice shall be properly given in accordance with § 4-5-203.

(d) If the immediate family members of the victim choose to be present at such execution, they shall be allowed to witness the execution from an area that is separate from the area to which other witnesses are admitted. If facilities are not available to provide immediate family members with a direct view of the execution, the warden of the state penitentiary may broadcast the execution by means of a closed circuit television system to the area in which the immediate family members are located.

T.C.A. § 40-23-116 (Supp. 2001)(emphasis added). Construction of a statute in its application to the facts of the case is an issue of law, and the appellate standard of review is *de novo* without any presumption of correctness given to the trial court's conclusions of law. The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *See Allen v. City of Gatlinburg*, 36 S.W.3d 73 (Tenn. Ct. App. 2001). In determining the intent of the legislature, the court is to examine the natural and ordinary meaning of the language used without a forced or subtle construction that would limit or extend the meaning of the language. *See Penley v. Honda Motor Co.*, 31 S.W.3d 181 (Tenn. 2000). "The statutory construction should reflect the meaning of the statute from the entire context thereof and from the statute's general purpose." *Wachovia Bank of N.Carolina, N.A. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000).

In the instant case, the trial court construing the statute found that the legislature intended "by using the particular wording the minister 'who has been preparing the condemned person for death'" that such person would be attended in his final hours by the minister until he enters the death chamber. We disagree with the trial court's interpretation.

The plain language of T.C.A. § 40-23-116 describes only the manner in which prison officials must carry out the death sentence and who may be present to witness the execution. In the phrase, "A priest or minister of the gospel who has been preparing the condemned person for death," the words, "who has been preparing the condemned person for death" describe only which priest or minister is legally entitled to be present at the prisoner's execution. Mr. Workman does not cite, nor are we aware of, other statutory provisions whereby the Tennessee legislature provides a condemned prisoner a right to be attended by his personal minister until the time of execution.

Certainly, the legislature may, as it has in the past, amend the death penalty statute to provide condemned prisoners with greater statutory rights,[2] but that is a matter left solely to the legislature. We hold that T.C.A. § 40-23-116 does not provide condemned prisoners a right to have their

---

[2]We note that, in May of 2000, the state legislature amended T.C.A. § 40-23-116 to permit a prisoner to have his defense counsel present at his execution.

personal religious ministers present at all times leading up to their execution, nor does it require a prison warden to provide condemned prisoners with such a right.

We next address together the first issue concerning the use of mandamus and the third issue of whether the restrictive religious visit was improper. The writ of mandamus is never granted to control or coerce the exercise of discretionary power by a government official. *See State v. Mayor & Aldermen*, 195 S.W.2d 11 (1946); *White's Creek Tpk. Co. v. Marshall*, 61 Tenn. 104 (1872); *Barnhart v. Neisler*, 25 Tenn. 493 (1846). The object of a writ of mandamus is to compel an official to perform an act which he has a legal duty to perform. *See Bradley v. State ex rel. Haggard*, 222 Tenn. 535, 438 S.W.2d 738 (1969). In determining whether an act is a "ministerial act" for which mandamus may lie, courts look to whether the law defines the duties to be performed "with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Lamb v. State*, 207 Tenn. 159, 338 S.W.2d 584, 586 (1960)(quoting C.J.S. Mandamus § 63). Where the duty involves the exercise of discretion or judgement, the act is discretionary. *See id.* A discretionary act, which will not support the issuance of a mandamus to compel performance, is defined as one done by an official who has lawful authority to determine whether or not he will perform the act. *See Bradley v. State ex rel. Haggard*, 222 Tenn. 535, 438 S.W.2d 738 (1969).

Since we have held that T.C.A. § 40-23-116 does not require a prison warden to allow a condemned prisoner the right to have his personal minister present until he enters the death chamber, we must next determine whether Warden Bell acted properly in restricting visits by Mr. Workman's minister. Courts will not, by mandamus, disturb the decision and action of public officials vested in discretionary powers, "except where they act in an arbitrary and oppressive manner, or act beyond their jurisdiction, or where they refuse to assume a jurisdiction which the law devolves upon them." *Peerless Constr. Co. v. Bass*, 14 S.W.2d 732, 733-34 (Tenn.1929)(citations omitted).

In this case, the Warden's discretion comes from Tennessee Department of Corrections policies regarding death row inmates. Specifically, Policy 506.16.2, Section VI.(C)(2)(b) provides:

> A final visit by the inmate's personal priest or minister may be permitted by the warden immediately prior to the execution. This visit shall take place at the front of the inmate's cell. This visit shall be limited to one (1) hour duration. *The warden shall decide the hours the visit will occur.*

(emphasis added). Warden Bell's affidavit submitted to the trial court states, in part:

> 4.      I have determined that a condemned inmate may meet with his personal priest or minister up until 10:00 p.m. prior to the execution. The basis for this decision is that the presence of the priest or minister in the death watch area presents a security risk. The identity of the execution team is kept confidential for the security of the institution and for the safety of the staff members and their families. Members of the execution team and their families may be

subject to retaliation and harassment if their identities became known throughout the institution or to the public at large.

5.    At approximately 10:00 p.m. members of the execution team, including the extraction team and others necessary to carry out an execution, begin to arrive at the execution area to begin final preparations for the execution. If the priest or minister is allowed to stay with the condemned inmate during this time, he or she may learn the identities of the execution team. As members of the execution team move about the building making final preparations, they are in plain view of the priest or minister from the visitation area and the death watch area. This creates a security risk by compromising the confidentiality of the execution team members' identities.

Although the Defendants/Appellants presented no evidence that Reverend Ingle <u>himself</u> posed any particular security risk, we find nothing in the record to indicate that the Warden acted in "an arbitrary and oppressive manner" or that he exceeded his discretionary authority under Department of Corrections policy in limiting Reverend Ingle's visit. The Warden's concern regarding confidentiality of the execution team finds statutory support in T.C.A. § 10-7-504(h)(1) (Supp. 2001), which provides in relevant part:

(h)(1) Notwithstanding any other law to the contrary, those parts of the record identifying an individual as a person who has been or may in the future be directly involved in the process of executing a sentence of death ***shall be treated as confidential*** and shall not be open to public inspection. For the purposes of this section "person" includes, but is not limited to, an employee of the state who has training related to direct involvement in the process of executing a sentence of death, a contractor or employee of a contractor, or a volunteer who has direct involvement in the process of executing a sentence of death. Records made confidential by this section include, but are not limited to, records related to remuneration to a person in connection with such person's participation in or preparation for the execution of a sentence of death.

(emphasis added).

Since no legal duty exists which requires a prison warden to allow a condemned prisoner to be attended by his personal minister until the time of his execution, and the Warden did not arbitrarily or improperly restrict Reverend Ingle's access to Mr. Workman, the trial court erred in issuing the writ of mandamus. We, therefore, reverse the Order of the chancery court and remand the case to the trial court for such other proceedings as may be necessary. Costs of this appeal are assessed to the Defendant/Appellant.

_____

W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.